## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ED TRACY,                    : Civil Action No. 06-1962(NLH)
                             :
    Plaintiff,           :
                             :
    v.                   :   **OPINION**
                             :
FILENET CORPORATION,         :
                             :
    Defendant.           :

**APPEARANCES:**

Herbert J. Stayton, Jr., Esquire
Ridgway & Stayton, LLC
Surety Building
3 East Stow Road
Suite 290
Marlton, NJ 08053-3191

       *Attorney for Plaintiff*

Edward T. Ellis, Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
457 Haddonfield Road
6th Floor
Cherry Hill, NJ 08002

       *Attorney for Defendant*

**HILLMAN**, District Judge

    This matter has come before the Court on Defendant's motion for summary judgment on all of Plaintiff's claims against it. For the reasons expressed below, Defendants' motion will be granted in part and denied in part.

## BACKGROUND

    Plaintiff, Ed Tracy, was employed by Defendant, FileNet Corporation, from June 1, 1992 until December 12, 2004, when

FileNet terminated Tracy's employment.  FileNet is a company that offers various software products and services to assist in the management of digital information and business processes, and Tracy served as one of its sales account executives.  At issue in this case are commissions on six accounts that Tracy alleges FileNet failed to pay him.  Tracy claims that FileNet's failure to pay him these commissions amounts to breach of contract, fraud, misrepresentation, and unjust enrichment.  FileNet has moved for summary judgment on all of Tracy's claims.  Tracy has opposed FileNet's motion.

## DISCUSSION

**A.   Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because this action is between citizens of different states.

**B.   Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such

2

that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

3

C.   **Analysis**

The main issue in this case is FileNet's non-payment of commissions for six accounts to which Tracy was assigned during the period of 2002-2004.  Tracy claims that he was entitled to these commissions, which were governed by Sales Compensation Plans.  The Plans provided that Tracy would be paid a certain percentage when a sale was "booked," and then the remaining percentage when the client paid.  The Plans also differentiated between the sale of maintenance services and the sale of software.

By not paying him commissions on six accounts, Tracy claims that FileNet breached their contract--i.e., the Plans.  Tracy also claims that FileNet's failure to pay him the commissions he was entitled to constituted fraud and resulted in unjust enrichment to FileNet.  Tracy further claims that FileNet made misrepresentations to him regarding his accounts.[1]

FileNet argues that Tracy is not entitled to the commissions he claims are due to him, and, consequently, it did not breach the parties' contract, and it did not defraud Tracy or become unjustly enriched.  Additionally, FileNet argues that Tracy has not submitted any evidence to support his misrepresentation claims.

_____

[1]Tracy has not specified whether he is claiming negligent and/or fraudulent misrepresentation.  The Court will discuss both theories below.

4

1.   ***Whether FileNet breached the parties' contract***

Under New Jersey law,[2] in order to be successful on a breach of contract claim, a plaintiff must prove the following four elements: (1) a contract; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that plaintiff performed its own contractual duties.  Hutchinson v. Del. Sav. Bank FSB, 410 F. Supp. 2d 374, 385 n.21 (D.N.J. 2006) (citation omitted).  Because different contracts govern the six accounts at issue, each account will be analyzed separately.

a.   **CIGNA account**

Tracy claims that he was given the CIGNA account on or about May 25, 2002 because the prior account executive, Tom O'Dwyer, had been fired.  On May 10, 2002, while O'Dwyer was still the account executive, CIGNA had placed an order for software and maintenance services.  CIGNA paid for the maintenance contract on June 11, 2002, and made three payments for the rest of the order on June 17, 2002, September 19, 2002, and December 17, 2002.  Tracy claims that FileNet paid O'Dwyer the commissions as part of his a termination/severance package.  Tracy argues that because he was the account executive on the account when CIGNA paid on the contract, he was entitled to the commissions, and not O'Dwyer.

---

[2]Neither party appears to dispute the application of New Jersey law to this case.

5

FileNet first argues that according to Tracy's own deposition testimony, he assumed responsibility for the CIGNA account on or about June 30, 2002, not on or about May 25, 2002. Further, FileNet argues that Tracy is not entitled to those commissions on the May 10, 2002 CIGNA contract because O'Dwyer booked the transaction. FileNet also argues that Tracy is not entitled to the commissions because when CIGNA made its payments, the CIGNA account remained unassigned, and pursuant to the 2002 Plan, no commission is earned or paid when an account is unassigned.

The applicable contract here is the 2002 Sales Compensation Plan. The 2002 Plan provided that the account executive would receive fifty-five percent of his commission upon the booking of the order, and forty-five percent upon payment of the order. (Def. Ex. 6 at 35.) The 2002 Plan also provided that FileNet only recognized an account reassignment when an "Account Reassignment Form" had been received and approved, and until the customer's file was updated to reflect the new account executive, the account would remain unassigned. (Id. at 16.) The Plan further provided that no commission was to be earned or paid for periods in which the account was unassigned. (Id.) The 2002 Plan also provided, however, "If a Participant is removed from a particular account due to termination, transfer, promotion, etc., the account must be re-assigned. The re-assignment should be

6

effective the day after the former Participant has been removed from the account.  There will be no duplication of account assignments except as expressly approved by the President." (Id.)

Regardless of which date Tracy claims to have assumed the CIGNA account, it cannot be disputed that Tracy is not entitled to the commission for booking the CIGNA order because, as Tracy admits, the order was booked on May 10, 2002, prior to either date Tracy claims he assumed the account.  Thus, the disputed issue with regard to the CIGNA account is whether FileNet breached the 2002 Plan when it failed to pay Tracy commission when CIGNA paid for its order.

Based on the 2002 Plan language and the undisputed timeline of events, a disputed issue of fact remains with regard to whether Tracy is entitled to commissions on the CIGNA account.[3] Tracy stated in his deposition that he was given the CIGNA account when he met with his boss, Charlie Taverna, around June 30, 2002 in Avalon, New Jersey.  (Tracy Dep. at 179.)  Tracy stated that when he met Taverna, Taverna had "a list of accounts that he now said you are going to be responsible for this, and CIGNA was one of them."  (Id. at 179-80.)  Tracy further stated

_____

[3]A disputed issues exists as to CIGNA's payments on September 19, 2002 and December 17, 2002, but not on the June 17, 2002 payment because Tracy admits in his deposition testimony that he was not assigned the account until June 30, 2002.

7

that he was given the account because the current account executive had been fired.  FileNet argues, however, that because Tracy has not provided any evidence that an "Account Reassignment Form" was received and approved so that the CIGNA account was assigned to him, it proves that Tracy was not assigned the account and is not entitled to commissions.

FileNet's argument is unavailing.  Even though the term of the contract governing the payment of commissions requires that the account must be formally assigned before commissions are paid, FileNet has failed to show that the "formal assignment" procedure is Tracy's obligation.  The 2002 Plan provides that an account reassignment form must be received and approved before the account will be classified as reassigned.  FileNet has not shown that Tracy must affirmatively participate in the reassignment process.

Stated differently, FileNet has failed to show the mechanism how an Account Reassignment Form is executed and approved. Indeed, it would be in FileNet's interest not to approve the reassignment until CIGNA completed its payments and the commissions were paid to the former account executive as a severance package.[4]   Furthermore, the 2002 Plan also provides

---

[4]See Plaintiff's Exhibit P, which is an email evidencing that FileNet was going to pay O'Dwyer the full commissions on the CIGNA account as a termination settlement.

that if an account executive is removed from an account due to termination, the account must be reassigned the day after the former account executive has been removed from the account. Thus, when O'Dwyer was removed from the CIGNA account, FileNet was required by the terms of the 2002 Plan to reassign the account the next day.  Because FileNet has not shown that it was Tracy's obligation to prepare the Account Reassignment Form, or that he otherwise failed to initiate or participate in the reassignment process, it has failed to provide an essential factual predicate underlying its summary judgment theory. Because it is FileNet's responsibility to assign the account the day after O'Dwyer's termination, it is FileNet's burden on summary judgment to demonstrate the absence of material fact as to when Tracy assumed responsibility for the account.  Because FileNet has failed to do so, an issue of fact remains as to whether Tracy is entitled to the commissions.  Consequently, summary judgment must be denied.

> **b.   GMAC account**

From February 15, 2003 until May 14, 2003, Tracy was out of work on Family Medical Leave Act ("FMLA") leave due to a rotator cuff injury.  Tracy claims that two days before he went out on leave, he had made a proposal to GMAC for a software licensing agreement.  The day after he returned from leave, Tracy claims that Taverna told him that the GMAC account was going to be

9

reassigned to a newly-hired account executive, David Hornstein. Tracy alleges that if he had not been removed from the account, he would have secured a $700,000 sale.[5]

Tracy has not articulated how he is entitled to any commissions on the GMAC account.  First, Tracy cannot receive commissions on a sale that never occurred.  Second, the GMAC order was booked in June 2004 and collected in August 2004. Hornstein had been officially reassigned the GMAC account effective June 2003.  (Pl. Ex. I.)  From the time that the account was reassigned in June 2003, it had never been assigned back to Tracy.  As with the 2002 Plan, the 2003 and 2004 Plans paid commissions upon booking and payment by the customer.  (Def. Ex. 7,8 at 3.)  Tracy admits that he was not assigned the account when it was booked and paid in the summer of 2004.  Consequently, FileNet did not breach the parties' contract by not paying him commissions on the GMAC account.[6]

### c. *State of New Jersey account*

On or about July 16, 2003, Tracy claims that he made a

---

[5]Tracy has not asserted a claim for a violation of the FMLA. Tracy has also not asserted a claim for a breach of the implied covenant of good faith and fair dealing.

[6]If Tracy is arguing that FileNet breached the contract by reassigning his account to a different account executive, Tracy has not proven this claim, or shown that a material fact exists as to this claim.  The 2003 Plan provides that assignments "may be modified at any time by a new written assignment in FileNET's sole and absolute discretion."  (Def. Ex. 7 at 6.)

proposal to the State of New Jersey for a five year extension on its existing maintenance contract, as well as for a transition to FileNet's new P-8 architecture, which is a software product. Tracy's proposal was incorporated into an agreement with the State of New Jersey.  When the order was booked and collected, Tracy was paid a two percent commission, which is the commission rate for maintenance contracts.  Tracy claims that he was also entitled to commission for the portion of the deal that was for software.  FileNet argues, however, that it was Tracy himself who booked the deal with the State of New Jersey as a maintenance contract, and as such, it had no choice to recognize the revenue on the entire deal as maintenance, rather than as software, and, thus, pay him only commission for maintenance.

The 2003 and 2004 Plans provide for arrangements involving multiple elements, which consist of "any software arrangement that provides the customer with the right to any combination of additional software deliverables, services or post contract customer support." (Def. Ex. 7, at 18.)  For these types of arrangements, "the entire fee from the arrangement must be allocated to each of the individual elements, based on each element's fair value."  (Id.)

Tracy argues that FileNet breached this provision when it did not allocate the multiple elements of the State of New Jersey contract, and instead allocated it as only maintenance.  FileNet

11

argues that it did not breach this provision because Tracy's proposal was labeled solely as a maintenance contract, and not a multi-element contract, and as such, it could only allocate the revenue as maintenance.

Tracy's July 16, 2003 proposal to the State of New Jersey was titled, "A Maintenance Discount Proposal from FileNET Corporation to The State of New Jersey." (Pl.'s Ex. M, Def.'s Ex. 10.) It provided, "FileNET Corporation is offering a five (5) year maintenance contract extension to The State of New Jersey that provides substantial discounts and allows The State of New Jersey to transition existing Panagon Software Licenses, that it owns, to P-8 product architecture. The contract period for maintenance includes an option to extend the maintenance contract for a sixth year." (Id.) The proposal also included additional terms for software product installation. (Id.) This proposal was eventually incorporated into FileNet's contract with the State of New Jersey.

To support its contention that it had no choice but to classify the deal as one solely for maintenance, FileNet has provided a declaration of Peggy Thorpe, Senior Accounting Manager for FileNet. Thorpe states that the "transaction was structured as a maintenance contract and Tracy categorized the transaction as maintenance." (Thorpe Dec. ¶ 8.) "As a result, FileNet was not able to account for the revenue from this transaction as

12

software," and "it was forced to recognize the revenue on the transaction ratably as maintenance support revenue, rather than software revenue," because "FileNet does not have discretion in revenue recognition on software transactions."  (<u>Id.</u> ¶¶ 9-11.) Thorpe states that public securities regulations and the financial accounting standards board govern the recognition of revenue for all publicly held corporations.  (<u>Id.</u> ¶ 11.)  When the transaction booked in September 2003, Thorpe states that "FileNet accounted for the transaction as maintenance on its books, and paid Tracy in accordance with the 2003 Commission Plan."  (<u>Id.</u> ¶¶ 12-13.)

Tracy counters with his own affidavit.  Tracy states that prior to making the proposal to the state, he was directed by "Phil Rugani, FileNet Vice-President of Sales-Americas and Steve Johnson, FileNet Vice-President, East to propose a product transition [] to the existing, expiring maintenance agreement, to a new software product, P-8, which involved new licensure and was not a product upgrade."  (Tracy Aff. ¶ 16.)  Tracy states that this transaction "was an arrangement involving multiple elements," and "[u]nder the direction of senior sales management and contract administration and finance of . . . FileNet, all costs were shown as maintenance costs."  (<u>Id.</u> ¶ 20.)

Tracy further states that as the result of the proposal, FileNet and the state "entered into an agreement proposed by

13

FileNet senior sales representatives Phil Rugani and Steve Johnson, and FileNet Contract Administration representative, Kevin Taylor," and if "this proposal/contract was a maintenance agreement, FileNet senior sales representatives would not have been involved and executed the contract." (Id. ¶ 19.)  Tracy also states that "[f]ollowing the proposal, sales management, contract administration, finance and order entry configured the transaction," and the "value of the new software licensing product was discounted by FileNet administration 100% to zero." (Id. ¶ 18.)

In its reply brief, FileNet points out that Tracy acknowledged in his deposition that in order to receive software commissions, the transaction has to be booked as software. (Tracy Dep. at 243.)  FileNet also points out that Tracy acknowledged that the State of New Jersey contract was booked as maintenance.  (Tracy Dep. at 242, 244-25.)  FileNet argues that because Tracy knew that the contract booked as maintenance, and that in order to receive software commissions, the contract would have had to book as software, Tracy was not entitled to software commissions.

FileNet further argues that Tracy has failed to show how FileNet breached the multi-element provision in the 2003 Plan. FileNet argues that after the state entered into the agreement, FileNet possessed documentation prepared by Tracy that referred

14

to the transaction as solely maintenance, and this documentation
was incorporated into the agreement, along with other documents
that allocated the product.  Because the documentation
characterized the product as maintenance only, FileNet argues
that it could not recognize the revenue as maintenance,
regardless if other documentation allocated the product
separately.

An issue of material fact exists as to whether FileNet
breached the 2003 Plan when it classified the contract as
maintenance only, instead of recognizing its multiple elements.
The 2003 Plan specifically provides that for any software
arrangement that provides the customer with a combination of
additional software deliverables, services or post contract
customer support, the entire fee from the arrangement must be
allocated to each of the individual elements, based on each
element's fair value.  FileNet has only provided evidence that
when a contract is booked as maintenance, commissions can be paid
only for maintenance.  Tracy does not dispute that--indeed, Tracy
acknowledges that point.  The dispute here, however, concerns
whether the contract should have been classified as a multi-
element contract as required by the 2003 Plan.

Tracy has submitted evidence that the classification of the
contract as solely maintenance was not his decision alone, but
rather a directive from senior FileNet staff.  Tracy states in

15

his affidavit that it was the senior sales representatives and
others who made the decision to craft the contract as
maintenance, rather than as a multi-element contract.  Moreover,
in his deposition, when Tracy was asked whether he knew what went
into the determination of booking this order as maintenance,
Tracy responded, "That's not for me.  I just did what he [Mr.
Rugani] told me to do."  (Tracy Dep. at 242-43.)  Tracy also
contends that because there was no software sales contract in
existence with the State of New Jersey, "[i]n order to avoid the
time constraints associated with the public bidding laws, a plan
was developed to renew and extend an existing maintenance
contract with the State of New Jersey."[7]  (Pl.'s Opp. at 22.)
FileNet has not submitted any proof contradicting these
allegations.[8]  Consequently, FileNet's motion for summary
judgment must be denied as to whether FileNet breached the 2003
Plan when the contract with the State of New Jersey was

---

[7]This statement appears to raise the issue of whether Tracy
joined in a conscious plain to evade public contract bidding
regulation.  We leave for another day whether such a plan by
FileNet senior management existed, and what role, if any, Tracy
played in that plan.

[8]In this regard, the Thorpe affidavit raises more questions
than it answers.  It appears to place sole responsibility for the
maintenance classification on Tracy, when Tracy's allegations, if
true, demonstrate the classification was made by senior
management.  We note, but do not address, whether a public
accountant has an obligation of due diligence to determine
management's view of the true purpose and nature of the company's
contractual obligations.

classified as maintenance instead of as a multi-element contract.

        d.    *JP Morgan Chase & Towers Perrin/EDS account*s

Tracy claims that in September 2004, he identified two accounts--JP Morgan Chase and Towers Perrin/EDS--that were out of compliance with their software licenses.  Tracy claims that as a result of his efforts, in June 2005, JP Morgan Chase made a purchase, and in September 2005, Towers Perrin/EDS made a purchase, but he did not receive commission on either of these transactions.[9]

FileNet argues that Tracy is not entitled to commissions on these transactions because: (1) the JP Morgan Chase order was booked in July 2005 and collected on July 28, 2005, and the Towers Perrin/EDS transaction booked in September 2005 and collected on December 22, 2005; (2) Tracy's employment terminated on December 10, 2004; (3) the 2004 Plan provides that commissions are paid upon booking and collection; and (4) the 2004 Plan provides that upon termination of employment, an account executive is entitled to receive earned commissions "up to the effective date of termination," (Def. Ex. 8 at 11).  Because

---

[9]In his statement of facts, Tracy also states, "In December 2004, J.P. Morgan Chase made a purchase which was precipitated by the Plaintiff's efforts in the account."  (Pl.'s Statement of Facts ¶ 53.)  FileNet does not address this allegation, and Tracy does not provide any support for it, and he does not discuss it in his brief.  Accordingly, the Court will not consider this claim.

Tracy was not longer employed at FileNet when the transactions were booked and paid, and because the commissions on these transactions were not pending when he left, FileNet argues that it did not breach the 2004 Plan when it did not pay him commissions on these accounts.

Tracy does not dispute FileNet's argument. Because there is no disputed issue as to these two accounts, Tracy's breach of contract claim relating to these two accounts must fail.

### d. *Princeton University account*

Tracy claims that while he was out on FMLA leave, an order was placed by his Princeton University account. Tracy claims that Taverna redirected the order to another account executive, John McDonald, so that McDonald would get the commissions on the transaction. Tracy further claims, however, that after FileNet paid McDonald the commissions, Princeton University "got angry" with McDonald and had the product de-installed. McDonald had to then repay the commissions to FileNet. As a result of this, Tracy claims that he no longer had any opportunity to garner business from this account.

FileNet argues that Tracy never amended his answers to interrogatories to include damages arising from the Princeton University account. Further, FileNet argues that when Tracy was questioned at his deposition about his breach of contract claims,

18

Tracy never mentioned that FileNet breached the 2003 Plan in reassigning that account.  Nonetheless, FileNet contends that it is entitled to summary judgment on this claim not only because of Tracy's failure to raise the claim prior to his opposition to summary judgment, but also because FileNet was permitted by the 2003 Plan to reassign his account, and because the transaction Tracy refers to actually occurred after he returned from leave, which was after the account had been reassigned.

FileNet's arguments are all correct, and the evidence supports its position.  As a result, FileNet is entitled to summary judgment on Tracy's breach of contract claim for the Princeton University account.

> **2.    *Whether FileNet committed fraud, or made fraudulent or negligent misrepresentations***

Tracy has also asserted claims for fraud and misrepresentation.  Because it is not clear whether Tracy is alleging fraudulent misrepresentation or negligent misrepresentation, both will be discussed.

To state a claim for common law fraud, a plaintiff must prove: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.  <u>Gennari v. Weichert Co. Realtors</u>, 691 A.2d

350, 367 (N.J. 1997) (citation omitted).

To sustain a cause of action for fraudulent misrepresentation under New Jersey law, the following elements must be proven:

> (1) a material misrepresentation of a presently existing or past fact; (2) made with knowledge of its falsity by the person making the misrepresentation; (3) intent that the misrepresentation be relied upon; (4) reliance on the misrepresentation, and (5) damage to the party who relied on the misrepresentation.

First Valley Leasing, Inc. v. Goushy, 795 F. Supp. 693, 701 (D.N.J. 1992) (citing Jewish Center of Sussex County v. Whale, 432 A.2d 521 (N.J. 1981)) (other citations omitted)).

To establish a claim for negligent misrepresentation, a plaintiff must show "'[a]n incorrect statement, negligently made and justifiably relied on, which results in economic loss.'" Konover Const. Corp. v. East Coast Const. Services Corp., 420 F. Supp. 2d 366, 370 (D.N.J. 2006) (quoting McClellan v. Feit, 870 A.2d 644, 648 (N.J. Super. Ct. App. Div. 2005) (citation omitted)). The "actual receipt and consideration of any misstatement remains central to the case of any plaintiff seeking to prove that he or she was deceived by the misstatement or omission." Kaufman v. i-Stat Corp., 754 A.2d 1188, 1195-96 (N.J. 2000). Negligent misrepresentation is easier to prove than fraud because it does not require scienter as an element. Id.

Tracy claims that FileNet fraudulently denied him the

benefits of his contract.  Specifically, Tracy claims that
FileNet fraudulently denied paying him the 2003 commissions for
the Princeton University transaction, and the 2003 and 2004
commissions for the State of New Jersey transaction.

Tracy also claims that FileNet made several
misrepresentations to him.  Specifically, Tracy claims that
Taverna stated that he would manage his accounts while he was out
on FMLA leave, and that his accounts would be there when he came
back.  Tracy also claims that FileNet sales management directed
him to get the sale from the State of New Jersey, and he was to
fill out a certain report in order to be paid commissions on
software revenue.  Additionally, with regard to his termination
in December 2004 because he accepted a job with a competitor,
Tracy claims that FileNet management misrepresented to him that
Adobe was not a competitor.  Based on that representation, and in
case his employment was terminated due to his poor performance
reviews, Tracy accepted a position with Adobe in the fall of
2004.  Tracy claims, however, that he had no intention of leaving
FileNet at the end of 2004 because he knew that some of his
accounts (JP Morgan Chase and Towers Perrin/EDS) would soon be
placing significant orders.  More generally, Tracy claims that
FileNet fraudulently denied Plaintiff the benefit of being paid
booking and collection commissions pursuant to his Sales
Compensation Plans by a course of action and conduct making it

21

difficult and/or impossible for Tracy to secure commission
booking and collection payment credit.

FileNet is entitled to summary judgment on all of these
claims.  First, with regard to his claims regarding 2003
commissions for the Princeton University transaction, because it
has already been determined that he was not entitled to those
commissions he is seeking, FileNet could not have defrauded Tracy
or made misrepresentations to Tracy with regard to these
commissions.  With regard to the 2003 and 2004 commissions for
the State of New Jersey transaction, even though Tracy has
alleged fraudulent activity with regard to the classification of
the contract, that alleged fraud is the state's claim, and not
Tracy's with regard to commissions, because Tracy does not allege
that the contract was classified as maintenance to defraud him
out of his commissions, but rather to secure the contract to
avoid the public bidding laws.[10]  As discussed above, the only
claim relevant to the State of New Jersey contract is whether
FileNet breached the 2003 Plan when it classified it as a

_____

[10]See note 7. Tracy has no claim for fraud against FileNet
based on any alleged private agreement with FileNet employees
whereby Tracy would help book the order as maintenance in order
to avoid the public bidding laws in exchange for commissions paid
for software, despite the booking classification.  Since Tracy
alleges that he was aware of this scheme, and indeed participated
in it, he cannot be a victim of fraud.  The essence of a fraud
claim is deception by a misstatement.  See Kaufman v. i-Stat
Corp., 754 A.2d 1188, 1195-96 (N.J. 2000).  Tracy does not claim
that he was deceived.

22

maintenance contract instead of a multi-element contract.

Second, with regard to Tracy's claim that Taverna stated that he would manage Tracy's accounts while he was out on FMLA leave, and that his accounts would be there when he came back, Tracy has not submitted any evidence to support this contention. Additionally, the 2003 Plan that governed the parties' relationship prior, during, and after Tracy's leave explicitly states that accounts may be reassigned at FileNet's discretion. This allegation alone is not enough to prove the elements of his fraud and misrepresentation claims.

Finally, with regard to Tracy's claim that FileNet told him that Adobe was not a competitor, and then fired him after he accepted a job with Adobe on the basis that Adobe was a competitor, again, Tracy has not provided any evidence, other than his unsupported allegations, to support this claim.  On the surface, a claim that an employer tells an employee that another company is not a competitor, and then fires the employee for accepting a job with the other company on the basis that it is a competitor sounds patently fraudulent.  And to prove this claim of fraud, at the very least for a negligent misrepresentation claim, Tracy must only show that FileNet negligently misrepresented that Adobe was not a competitor and he justifiably relied on that contention to his detriment.  But, even accepting as true that someone at FileNet told Tracy that Adobe was not a

competitor, and thereby blessed Tracy's acceptance of a job with
Adobe while still being employed by FileNet, Tracy admits that it
was because of his poor sales performance that he accepted a job
with Adobe in late November/December 2004 as "security blanket,"
and informed Adobe that he would start in January 2005.  (Pl.'s
Statement of Facts ¶ 60, citing Tracy Dep. at 166-168.)

Tracy does not allege that when he accepted a job with
Adobe, he intended to continue working for FileNet
simultaneously.  Instead, Tracy accepted the job with Adobe in
case he was terminated at the end of the year for poor
performance.  (Tracy Aff. ¶ 33.)  Further, Tracy does not allege
that if he not been terminated for his acceptance of a job at
Adobe, he would not have been fired for poor performance.  Thus,
Tracy cannot, and has not, demonstrated that he relied to his
detriment on FileNet's representation of Adobe's competitor
status.

### 3.  *Unjust Enrichment*

Tracy has also asserted a claim for unjust enrichment with
regard to FileNet's retention of the commissions which Tracy
claims he is owed.  Under New Jersey law, "to establish unjust
enrichment, a plaintiff must show both that defendant received a
benefit and that retention of that benefit without payment would
be unjust." VRG Corp. v. GKN Realty Corp., 641 A.2d 519, 526
(N.J. 1994).  Recovery under a theory of unjust enrichment is not

24

appropriate, however, when a valid, unrescinded contract governs the rights of the parties.  <u>Van Orman v. American Ins. Co.</u>, 680 F.2d 301, 310 (3d Cir. 1982); <u>see also</u> <u>Moser v. Milner Hotels, Inc.</u>, 78 A.2d 393, 394 (N.J. 1951).  Thus, because it has already been determined that valid, unrescinded contracts existed between the parties, Tracy cannot maintain a claim for unjust enrichment, and summary judgment must be entered in favor of FileNet on this claim.

## **CONCLUSION**

For the reasons expressed above, summary judgment in favor of FileNet must be entered on all of Tracy's claims except with regard to the CIGNA contract and the State of New Jersey contract.  An appropriate Order will issue.


Dated: December 28, 2007          s/ Noel L. Hillman

At Camden, New Jersey             NOEL L. HILLMAN, U.S.D.J.

25